USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #:_____
DATE FILED: 12/09/2022

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

FRANKIE LIPSETT, on behalf of himself
and all others similarly situated,

                    Plaintiff,

          - against -

BANCO POPULAR NORTH AMERICA d/b/a
POPULAR COMMUNITY BANK,

                    Defendant.

---

**22 Civ. 3901 (VM)**

**DECISION AND ORDER**

**VICTOR MARRERO, United States District Judge.**

Defendant Banco Popular N.A. (d/b/a Popular Community Bank) ("BPNA") seeks an order compelling Plaintiff Frankie Lipsett ("Lipsett") to arbitrate his claims against BPNA on an individual basis. On May 13, 2022, Lipsett brought this putative class action against BPNA seeking monetary damages arising from BNPA's alleged "assessment and collection of 'overdraft fees' . . . on accounts that were never actually overdrawn." (See Dkt. No. 1 ¶ 1.) Pursuant to the Court's Individual Rules of Practice, on June 10, 2022, BPNA filed a pre-motion letter regarding its proposed motion to compel arbitration (see Dkt. No. 7), which Lipsett responded to on August 9, 2022 (see Dkt. No. 16). The Court ordered a briefing schedule on the motion. (See Dkt. No. 17.)

BPNA filed its motion to compel arbitration and brief in support on September 8, 2022. ("Motion," Dkt. No. 20; "BPNA

Brief," Dkt. No. 21.) Lipsett opposed the motion on October
13, 2022, ("Opposition," Dkt. No. 22) and BPNA filed its reply
on November 3, 2022 ("Reply," Dkt. No. 23). After considering
the arguments, the Court ordered the parties to submit
supplemental briefing addressing two issues: whether the 2014
and 2021 versions of BPNA's deposit account agreements
constituted a request to Lipsett to enter into a new
agreement, and "the extent to which a party subject to an
agreement containing an arbitration provision with an opt-
out clause . . . has a continuing obligation or opportunity
to opt-out of arbitration each time the contract is amended
or whether the party is bound by their assent to or rejection
of arbitration at the first instance the opt-out procedure is
offered." (See Dkt. No 24.) The parties filed their joint
supplemental letter brief on November 21, 2022. (See "Suppl.
Br.," Dkt. No. 25.) The fully briefed motion is now before
the Court. For the following reasons, BPNA's motion to compel
arbitration is DENIED.

## I.    BACKGROUND

A.   FACTUAL BACKGROUND[1]

BPNA is a bank that provides retail banking services to
consumers and is headquartered in New York, New York. Lipsett

---

[1] Except as otherwise noted, the factual background derives from the facts
pleaded within Lipsett's Complaint, BPNA's Brief and accompanying
exhibits, and Lipsett's Opposition. Except when specifically quoted, no

opened an account with BPNA on or about August 9, 2004. Lipsett's use of his account is governed by BPNA's Personal Banking Disclosure and Agreement ("PBD&A"). In 2004, the then-effective version of the PBD&A was the one dated March 2002. (See 2002 PBD&A, Dkt. No. 21-3.)

The 2002 PBD&A did not contain any dispute resolution provision, let alone a provision requiring mandatory arbitration. However, it included a change of terms provision, which allowed BPNA to "change this Agreement at any time as allowed by law," and explained to its customers, like Lipsett, that they could be "bound by these changes, with or without notice." (Id. at 7.)

BPNA amended the PBD&A in 2008. (See "2008 PBD&A," Dkt. No. 21-4.) Unlike the March 2002 PBD&A, the 2008 version included an arbitration provision. The arbitration provision allowed either party to "elect to arbitrate -- and require the other party to arbitrate -- any 'Claim.'" (Id. at 14.) A "Claim" is defined broadly as including "any legal claim, dispute, or controversy between you and us that arises from or relates in any way to this Agreement or the deposit account," and includes the "Arbitration Provision" itself

---

further citation will be made to these documents, or to the documents referred to therein. Unless otherwise noted, all page citations are to the ECF page.

among the specific examples of issues subject to potential arbitration. (Id. at 15.)

The 2008 PBD&A's arbitration provision also contained an opt-out clause. That clause allowed a party to "elect to reject the Arbitration Provision" "[w]ithin 45 days after the date we open your deposit account." (Id. at 7.)

Although Lipsett remained a customer during this time and continued to use his BPNA account, neither party indicates that BPNA issued notice regarding the amendments comprising the 2008 PBD&A. The 2008 PBD&A, like the March 2002 version before it, allowed BPNA to make any changes to the agreement, with or without notice.

About six years later, on January 17, 2014, BPNA sent a notice to its customers, including Lipsett. That notice was titled "IMPORTANT INFORMATION -- REGARDING YOUR DEPOSIT ACCOUNT" and included the subtitle "Amended Account Agreement." (See "2014 Notice," Dkt. No. 21-6.) The 2014 Notice advised customers that BPNA had made "[m]odifications" to its customers' "initial account disclosures as a result of changes in federal regulations, state law and bank policy." (Id. at 2.) It continued that BPNA had "integrated the changes into the enclosed Personal / Business Banking Disclosure and Agreement (your 'Amended Account Agreement'), which replaces

any previous deposit account agreement and disclosures you may have had with us." (Id.)

The 2014 Notice also identified "terms that may warrant special attention," including a mandatory arbitration provision. The 2014 Notice explained that "there continue[d] to be a Mandatory Arbitration Provision that include[d] a Class Action Waiver," and encouraged customers to "familiarize [themselves] with these provisions and [their] rights and obligations." (Id.) Lipsett does not dispute he received the 2014 Notice.

The 2014 Notice also provided BPNA's customers an opportunity to reject the Amended Account Agreement in whole by closing their account. The 2014 Notice explained to Lipsett that if the "terms [were] unacceptable," he could "opt out of it by closing [his] account and withdrawing [his] funds within sixty (60) days of the date of this notice. Otherwise, [Lipsett would] be deemed to have accepted the Amended Account Agreement on the earlier of (1) [his] first use of [his] deposit account after five (5) days from the date of this notice or (2) sixty (60) days from the date of this notice." (Id.) Lipsett did not exercise this option.

The 2014 Notice enclosed the amended agreement that would control Lipsett's relationship with BPNA. (See "2013-2014 PBD&A," Dkt. No. 21-7.) And as previewed in the 2014

Notice, the 2013-2014 PBD&A continued to include an arbitration provision. The 2013-2014 PBD&A's arbitration provision's definition of "Claim" remained largely verbatim to the version introduced in 2008, but the opt-out provision included a change. Although retaining the clause allowing a new customer to reject the provision within 45 days of account opening, the 2013-2014 PBD&A now also allowed for "an existing customer" to "elect to reject the Arbitration Provision" if (1) BPNA was "asking [the customer] to enter into a new deposit agreement" and (2) the rejection letter was sent "within forty-five (45) days after [BPNA] provide[d] [] the new agreement." (Id.) After receiving the 2014 Notice and 2013-2014 PBD&A, Lipsett did not send a rejection letter to BPNA.

In 2021, BPNA again amended its PBD&A. (See "2021 PBD&A," Dkt. No. 21-5.) The 2021 PBD&A's arbitration provision included amended language defining "Claim" but otherwise substantively remained the same as the 2013-2014 PBD&A's provision, including with respect to how new and existing customers could opt out.

On January 27, 2022, before this action was commenced, Lipsett's attorney, Jeffrey D. Kaliel, mailed a letter to BPNA's Arbitration Administrator Customer Care Center, as designated in the 2021 PBD&A, purporting to opt Lipsett out

of the arbitration provision. (See Dkt. No. 21-9.) On May 17, 2022, after Lipsett filed this action, BPNA responded by "electing to arbitrate the claims made" by Lipsett. (See Dkt. No. 21-10.) In that letter, BPNA disputed that Lipsett's January 27, 2022 letter was timely and asserted its belief that Lipsett remained subject to the arbitration provision. BPNA now moves this Court to compel Lipsett to arbitrate his claims.

B.   <u>PARTIES' ARGUMENTS</u>

BPNA argues that Lipsett is subject to the arbitration provision. BPNA asserts that as early as 2008 "Lipsett could have rejected" the arbitration provision but did not. (BPNA Brief at 6.) And when Lipsett received the 2014 Notice, "Lipsett did not choose to reject that Arbitration Provision" and "continue[d] to use his account after receiving th[e] notice, thereby affirmatively assenting to the Arbitration Provision." (<u>Id.</u> at 6-7.) BPNA also contends that Lipsett's claims are covered by the arbitration provision, and, as a preliminary matter that the question of arbitrability itself should be decided by an arbitrator. (<u>Id.</u> at 10-15.)

Lipsett counters that no contract was formed with respect to the arbitration provision. Lipsett argues that the addition of the 2008 PBD&A's arbitration provision was non-binding because it exceeded the scope of the 2002 PBD&A's

provision that allowed BPNA to "change" but not "add" terms to the PBD&A. (Opposition at 8.) For this proposition, Lipsett relies on the Sixth Circuit opinion in Sevier County Schools Federal Credit Union v. Branch Banking & Trust Co., 990 F.3d 470 (6th Cir. 2021), which, applying Tennessee law, held that a bank's attempt to add a new arbitration provision exceeded the scope of the change provision of the governing contract and therefore did not require the plaintiff to arbitrate their claims. (Opposition at 9-12.)

Lipsett continues that his ability to opt out of arbitration was illusory as none of the opt-out provisions applied to him. (Id. at 14-15.) In particular, Lipsett points out that the 2008 PBD&A allowed him to opt out only "[w]ithin 45 days after the date" BPNA opened his account, but that Lipsett had opened his account around four years earlier. Lipsett concludes that "although he was required to opt-out [in 2008] to avoid arbitration, he cannot be found to have consented to arbitration at any point in time that followed." (Id.)

BPNA responds that Lipsett's arguments have already been rejected by another court in this District. In its Reply, BPNA cites to Valle v. ATM National, LLC, in which a court in this District assessed and rejected arguments similar to Lipsett's regarding the same change of terms and arbitration

provisions included in BPNA's 2013-2014 PBD&A at issue here. See No. 14 Civ. 7993, 2015 WL 413449 (S.D.N.Y. Jan. 30, 2015). BPNA asserts that Valle is controlling and that the Court should follow Valle in finding that Lipsett assented to the arbitration provision by continuing to use his account.

    C.   SUPPLEMENTAL BRIEFING

After reviewing the arguments, the Court ordered the parties to provide supplemental briefing addressing two questions. (See Dkt. No. 24.) First, the Court ordered the parties to address "whether BPNA's offerings of the 2014 PBD&A and 2021 PBD&A were a request by BPNA to Lipsett 'to enter into a new deposit agreement.'" (Id.)

In response to the first question, BPNA argues that the 2013-2014 PBD&A "completely replaced the prior Agreements, [and] served as a new deposit agreement rather than merely an amendment to the previous agreements." (Suppl. Br. at 2-3.) As a result, BPNA argues that as a new agreement, "Lipsett had an opportunity in 2014 to opt out" either under the terms of the 2014 Notice or under the terms of arbitration provision itself, i.e., within 45 days of receiving the 2013-2014 PBD&A. (Id.) That Lipsett did neither means, according to BPNA, that he is subject to arbitration.

Lipsett responds that "it is entirely unclear if the 2014 modification should be considered an offer to 'enter

into a new deposit agreement'" since neither the 2014 Notice nor the 2013-2014 PBD&A itself refer to a "new" deposit agreement. (Id. at 5.) Lipsett argues that any ambiguity should be resolved in Lipsett's favor. (Id.) Both parties agree that the 2021 PBD&A was not a new deposit agreement and that its opt-out provision did not apply to Lipsett. (Id. at 3, 5.)

Second, the Court ordered the parties to address "the extent to which a party subject to an agreement containing an arbitration provision with an opt-out clause . . . has a continuing obligation or opportunity to opt-out of arbitration each time the contract is amended or whether the party is bound by their assent to or rejection of arbitration at the first instance the opt-out procedure is offered." (Dkt. No. 24.)

In response, BPNA asserts that "[n]o provision of New York law affords consumers the right to opt out of an arbitration provision each time a consumer agreement containing one is otherwise amended." (Id. at 1.) BPNA contends that its PBD&A's do "not contain language affording account holders . . . the opportunity to opt out of the Arbitration Provision *except* when the account is first opened and when a completely new [PBD&A] is adopted." (Id.) As stated above, BPNA asserts that Lipsett was offered a completely new

PBD&A in January 2014, triggering his ability to opt out of arbitration.

## II.   <u>LEGAL STANDARD</u>

The Federal Arbitration Act ("FAA") governs whether the Court must compel arbitration. <u>See</u> 9 U.S.C. § 2 ("A written provision in . . . a contract evidencing a transaction involving commerce to settle by arbitration a controversy thereafter arising out of such contract or transaction . . . shall be valid, irrevocable, and enforceable[.]"). Federal policy favors arbitration; indeed, "it is difficult to overstate the strong federal policy in favor of arbitration, and it is a policy [the United States Court of Appeals for the Second Circuit has] often and emphatically applied." <u>Arciniaga v. Gen. Motors Corp.</u>, 460 F.3d 231, 234 (2d Cir. 2006).

Yet, the policy strongly encouraging arbitration does not always apply. For example, when courts are faced with resolving ambiguity over whether the terms of a "validly formed and enforceable arbitration agreement . . . covers the dispute at hand," the presumption applies. <u>Granite Rock Co. v. Int'l Brotherhood of Teamsters</u>, 561 U.S. 287, 301 (2010). But it "does not apply to disputes concerning whether an agreement to arbitrate has been made." <u>Applied Energetics, Inc. v. NewOak Capital Markets, LLC</u>, 645 F.3d 522, 526 (2d

Cir. 2011). For decades, the Supreme Court and the Second
Circuit have recognized that "'arbitration is a matter of
contract and a party cannot be required to submit to
arbitration any dispute which [it] has not agreed to so
submit.'" AT&T Techs., Inc. v. Commc'ns Workers of Am., 475
U.S. 643, 648 (1986) (quotation omitted); see also Vera v.
Saks & Co., 335 F.3d 109, 116 (2d Cir. 2003); Bell v. Cendant
Corp., 293 F.3d 563, 566 (2d Cir. 2002). To that end, courts
"may invalidate an arbitration agreement based on 'generally
applicable contract defenses.'" Kindred Nursing Ctrs. Ltd.
P'ship v. Clark, 137 S. Ct. 1421, 1426 (2017). And "in
deciding whether a contractual obligation to arbitrate
exists, courts should generally apply state-law principles
that govern the formation of contracts.'" Applied Energetics,
645 F.3d at 526 (quotation omitted).

Under New York law,[2] "contract formation and amendment
is governed by common law principles." Kulig v. Midland
Funding, LLC, No. 13 Civ. 4715, 2013 WL 6017444, at *4
(S.D.N.Y. Nov. 13, 2013). Contract formation and amendment
thus requires a "manifestation of mutual assent [that is]
sufficiently definite to assure that the parties are truly in

---

[2] The parties and the PBD&As apply New York law to determine the
enforceability of the arbitration provision. (See, e.g., 2008 PBD&A at 17
("the law of New York . . . shall be applicable to the extent that any
state law is relevant in determining the enforceability of this
Arbitration Provision under Section 2 of the FAA.").)

agreement with respect to all materials terms." Starke v. SquareTrade, Inc., 913 F.3d 279, 289 (2d Cir. 2019) (citation omitted). "Fundamental to the establishment of contract modification is proof of each element requisite to the formulation of a contract, including mutual assent to its terms." Beacon Terminal Corp. v. Chemprene, Inc., 75 A.D.2d 350, 354 (N.Y. App. Div. 2d Dep't 1980). "No one will be held to have surrendered or modified any of his contract rights unless he is shown to have assented thereto in a manner that satisfies the requirements of a valid contract." Louis Dreyfus Negoce S.A. v. Blystad Shipping & Trading Inc., 252 F.3d 218, 228 (2d Cir.2001) (quoting Corbin on Contracts § 1293 (1962)).

However, "[t]he manifestation of expression of assent necessary to form a contract may be by word, act, or conduct which evinces the intention of the parties to contract." Maffea v. Ippolito, 247 A.D.2d 366, 367 (N.Y. App. Div. 2d Dep't 1998). Courts in this District and elsewhere have found that with respect to bank deposit account agreements, such as the one at issue here, "customers accept revised terms of their accounts by continuing to use their accounts after receiving the revised terms," provided the customer is given "ample opportunity to opt-out" of the amended contract's terms. Valle, 2015 WL 413449, at *3 (collecting cases).

### III. <u>DISCUSSION</u>

The Court must first assess whether a valid and enforceable agreement to arbitrate exists between Lipsett and BPNA. The Court concludes that because Lipsett had no meaningful opportunity to opt out of arbitration in 2008, in other words to clearly manifest assent to arbitration at that time, no contract to arbitrate was formed. Accordingly, BPNA's addition of the arbitration provision is invalid and not binding as to Lipsett. Because the Court so concludes, it does not address the parties' remaining arguments regarding the scope and arbitrability of the arbitration provision.

A. <u>THE VALLE DECISION</u>

As noted above, BPNA primarily relies on the decision in <u>Valle v. ATM Nat'l, LLC</u> to argue that Lipsett's continued use of his account after receiving the 2014 Notice and 2013-2014 PBD&A establishes his assent to be bound by the arbitration provision. (<u>See</u> <u>generally</u> Reply.) Although <u>Valle</u> assessed what is, for all intents and purposes, the exact same arbitration provision and notice at issue here, the Court is not bound by that decision.

<u>Valle</u> is factually distinct from the facts presented here. In <u>Valle</u>, the plaintiff opened a savings account with BPNA in 1999, but "[n]either party [was] able to produce the contract in existence when plaintiffs' account was opened."

2015 WL 413449, at *1. As a result, the only evidence before the Court in assessing whether the arbitration provision was valid and binding on the plaintiffs was the 2014 Notice and the 2013-2014 PBD&A. See id. at *1-2. The court in Valle thus addressed only the effect of those two documents on whether a binding agreement to arbitrate was formed.

Reviewing those two documents, the court found that a contract had been formed. It assessed the 2014 Notice and the 2013-2014 PBD&A and determined that they provided plaintiffs with a meaningful opportunity to opt out of arbitration (which was not exercised) by allowing customers to either reject the agreement all together by closing their account within 60 days or sending a signed arbitration rejection notice within 45 days. See id. at *3. Then, because plaintiffs continued using their accounts, the court in Valle concluded that plaintiffs should be deemed to have accepted the revised terms of their accounts.

The facts presented here are distinct. In contrast to Valle, the 2002 PBD&A, the 2008 PBD&A, and the 2021 PBD&A are also before the Court here. As discussed in more detail below, the changing terms set forth in these documents have a significant effect on whether a binding agreement to arbitrate was formed with Lipsett. The Valle court did not have the benefit of argument presented here on how the

changing terms between the 2002, 2008, and 2013-2014 PBD&A affected mutual assent. Therefore, "even if [Valle] were binding authority on this Court, it is factually distinct from the case at issue here," and would not constrain the Court's decision-making. Marshall v. United States, 368 F. Supp. 3d 674, 680 (S.D.N.Y. 2019).

   B.   CHANGE OF TERMS PROVISION

   Lipsett first attacks the addition of the arbitration provision to the 2008 PBD&A. He asserts that its addition exceeded the scope of the 2002 PBD&A's change of terms provision. The 2002 PBD&A, which controlled Lipsett's use of the account when he opened it in 2004, allowed BPNA to "change this Agreement at any time as allowed by law," with or without notice to Lipsett.[3] (Dkt. No. 21-3 at 7.) Lipsett asserts that

---

[3] The 2008 PBD&A contained an identical change of terms provision. (See Dkt. No. 21-4 at 19.) The 2013-2014 PBD&A provision was drafted differently and reads, "We may change, amend or supplement this Agreement at any time as allowed by applicable law. You may be bound by these changes, with or without notice, as the case may be and as allowed by applicable law." (Dkt. No. 21-7 at 11.) The addition of "amend or supplement" in the 2013-2014 PBD&A could be read to provide BPNA with a somewhat broader authority to add terms to the agreement as the plain meanings of both "amend" and "supplement" suggest the addition of terms as proper. See Supplement, OXFORD ENGLISH DICTIONARY (3d ed. 2012) ("1. To provide supplement to; to make good a deficiency in . . . 3. To add as a supplementary statement or remark."); Amend, OXFORD ENGLISH DICTIONARY (3d ed. 2020) ("3. To alter . . . by adding, removing, or rewording a clause or provision."); cf. Badie, 67 Cal. App. 4th at 797 (rejecting lower court's "conclusion that 'change' was intended to mean 'add' [as] questionable in light of the fact that the phrase stating that the Bank could 'add' new terms had been deleted from the revised version of the change of terms provision"). Nevertheless, BPNA's potentially more expansive authority to add terms via the 2013-2014 PBD&A's change of terms provision would apply only prospectively, i.e., affecting only terms added to the 2021 PBD&A. As discussed below, the dispositive issues here revolve around the changing terms as between the 2002, 2008, and up until the

this provision "does not permit the unilateral *addition* of any arbitration provision, but rather only permits the Bank to '*change*' existing terms." (Opposition at 8.) He contends that because the addition of the arbitration provision exceeded the scope of the change of term clause, its addition was non-binding and unenforceable.

To determine whether the addition of a certain contractual provision exceeded the scope of a change of terms provision, courts in this Circuit and elsewhere have looked to the seminal California state court decision in Badie v. Bank of America, 67 Cal. App. 4th 779 (Cal. Ct. App. 1998). See Stone v. Golden Wexler & Sarnese, P.C., 341 F. Supp. 2d 189, 194 (E.D.N.Y. 2004); Follman v. World Fin. Network Nat'l Bank, 721 F. Supp. 2d 158, 165 (E.D.N.Y. 2010); Filho v. Safta Nat'l Bank of New York, 797 F. Supp. 2d 289, 295 (S.D.N.Y. 2011); Valle, 2015 WL 413449, at *4; Sevier Cty. Schs., 990 F.3d at 479.

In Badie, the court assessed whether an arbitration provision added to deposit and credit card agreements with a bank was valid and enforceable when added via the contract's change of terms provision. The defendant bank in Badie mailed

---

2013-2014 PBD&As. What could be added in 2021 under the 2013-2014 PBD&A change or terms provision does not affect the Court's analysis or conclusion.

out a "bill stuffer" advising its customers that it was adding an arbitration provision to its contracts where one had not previously existed and gave them no opportunity to reject the provision. The bank contended that the addition of the arbitration provision was proper under its change of terms provision that provided the bank with the discretion to "change any term, condition, service or feature" of any account "at any time" and required the bank to "provide [the customer] with notice of the change to the extent required by law." Badie, 67 Cal. App. 4th at 786. Further, the bank argued that "regardless of the nature of a modification, the new [arbitration] provision is a valid part of the contract as long as the prescribed procedure for making the modification was followed." Id. at 791.

The court in Badie found that the change of terms provision had "no limitation on the substantive nature of the changes [the bank] may make" unilaterally, and warned that "permitting the Bank to exercise its unilateral rights under the change of terms provision, without any limitation on the substantive nature of the change permitted, would open the door to a claim that the agreements are illusory." Id. at 796-97. Although not finding that the agreement was illusory, the court concluded, after applying general principles of contract interpretation, that the "parties did not intend

that the change of terms provision should permit the Bank to add new contract terms that differ *in kind* from the terms and conditions included in the original agreements." Id. at 803.

Courts in this Circuit assessing Badie have derived two main holdings. First, they have interpreted Badie as instructing courts to assess "not whether defendant may *add* new terms, but whether the terms added are the *types of terms* the contract contemplated defendant could add." Follman v. World Fin. Network Nat'l Bank, 721 F. Supp. 2d 158, 165 (E.D.N.Y. 2010); see also Stone v. Golden Wexler & Sarnese, P.C., 341 F. Supp. 2d 189, 196 (E.D.N.Y. 2004). But, regardless of whether the added provision was the type of term falling within the ambit of the parties' expectation, courts also recognize Badie and its progeny as advancing the following more general consideration: whether the unilateral addition of an unexpected term to a contract, that is otherwise inappropriate, is alleviated by affording the customer a meaningful or ample opportunity to opt out of the term. See Valle, 2015 WL 413449, at *4; Sevier Cty. Schs., 990 F.3d at 480.

In applying that general consideration, the Court must address whether Lipsett, who undisputedly continued to use his account after receiving each of the PBD&As, was provided an opportunity to opt out of the arbitration provision when

it was added in 2008 and amended in 2014. As Lipsett's ability to opt out is dispositive of whether a contract was formed, the Court does not address whether the various change of terms provisions provided BPNA the authority to add the arbitration provision.

C.   OPPORTUNITY TO OPT OUT

The general rule derived from Badie -- directing courts to assess whether the plaintiff had a meaningful opportunity to opt out -- asks the Court, in essence, to determine whether the purported contract is unconscionable. While neither party addressed whether BPNA's addition of the arbitration provision to the PBD&A, in its various forms, was unconscionable, and instead focused on whether the addition violated the covenant of good faith and fair dealing, the Court's review of authority persuades it that the unconscionability analysis is the proper path to take.[4]

In New York, "[a] determination of unconscionability generally requires a showing that the contract was both procedurally and substantively unconscionable when made." David v. #1 Mktg. Serv., Inc., 113 A.D.3d 810, 812 (N.Y. App. Div. 2d Dep't 2014) (quoting Simar Holding Corp. v. GSC, 87

---

[4] Because the Court is persuaded that the addition of the arbitration provision in 2008 was unconscionable, its addition necessarily would violate the covenant of good faith and fair dealing.

A.D.3d 688, 689 (N.Y. App. Div. 2d Dep't 2011) (quotation omitted)). "Courts assess overall unconscionability by applying a 'sliding scale' where 'the more questionable the meaningfulness of choice, the less imbalance in a contract's terms should be tolerated and vice versa.'" Haft v. Haier US Appliance Solutions, Inc., 578 F. Supp. 3d 436, 452 (S.D.N.Y. 2022) (citing Shema Kolainu-Hear Our Voices v. ProviderSoft, LLC, 832 F. Supp. 2d 194, 201 (E.D.N.Y. 2010) (quoting State v. Woloqwitz, 96 A.D.2d 47, 68 (N.Y. App. Div. 2d Dep't 1983))). In essence, as the facts surrounding the addition of a contractual term become more procedurally suspect, courts may be less concerned with the substance of the terms themselves. "Courts applying New York law have considered an opt-out provision as an important, if not dispositive, factor in rejecting [or in this case, accepting,] challenges of procedural unconscionability." Kai Peng v. Uber Techs. Inc., 237 F. Supp. 3d 36, 55-56 (E.D.N.Y. 2017) (collecting cases).

The analysis begins with the addition of the arbitration provision to the 2008 PBD&A. BPNA contends that Lipsett was bound by BPNA's addition of the arbitration agreement at the earliest as part of the 2008 PBD&A. (See BPNA Brief at 2-3; Suppl. Br. at 2 n.1.) The Court finds that the addition of the 2008 PBD&A was unconscionable because Lipsett had no

notice, and no meaningful and reasonable opportunity to opt out for the following two reasons.

First, Lipsett indicates that he never received notice of the 2008 PBD&A, a point that BPNA does not directly dispute. (Cf. BPNA Brief at 3 (indicating that "Lipsett received actual notice of the Arbitration Provision no later than January 2014").) Without notice of the 2008 PBD&A, Lipsett's opportunity to opt out (which as explained below was none) was diminished, and so too was his ability to cancel the contract entirely to avoid the effect of the arbitration provision.

Second, unlike later versions of the PBD&A, the 2008 version of the opt-out provision was limited: Lipsett could only "reject th[e] Arbitration Provision by mailing a signed rejection notice . . . within 45 days *after the date [BPNA] open[ed] [his] Account*." (Dkt. No. 21-4 at 13 (emphasis added).) It is undisputed that BPNA opened Lipsett's account in 2004, nearly four years before the 2008 PBD&A became effective. Accordingly, the plain terms of the opt-out procedure in the 2008 PBD&A do not apply to Lipsett, as they provide him *no* opportunity, much less a meaningful one, to opt out of arbitration.

BPNA appears to acknowledge that Lipsett's ability to opt out of the 2008 PBD&A was so limited. With respect to the

2021 PBD&A, BPNA states that Lipsett "did not have the right to opt out of the Arbitration Provision" in 2021 "[b]ecause Lipsett had not opened his account," within 45 days of when it was amended. (Suppl. Br. at 4.) BPNA cannot reasonably argue that a distinction exists between the 2008 and 2021 PBD&As with respect to the account opening clause of the opt-out procedure. The lack of notice and absolute lack of opportunity for Lipsett to opt out render the 2008 PBD&A unconscionable under New York law, which seeks to "ensure that the more powerful party" -- here, BPNA -- "cannot 'surprise' the other party with some overly oppressive term," like an arbitration provision with an opt-out procedure that could never be exercised. Bank v. WorldCom, Inc., No. 122484/00, 2002 WL 171629 (N.Y. Sup. Ct. Jan. 24, 2002) (citing Matter of State of New York v. Avco Fin. Serv. N.Y., Inc., 406 N.E.2d 1075, 1078 (N.Y. 1980)).

BPNA attempts to save the arbitration provision by pointing to the 2014 Notice and 2013-2014 PBD&A, which it asserts, citing Valle, provided Lipsett with meaningful and reasonable notice and opportunity to opt out. The Court disagrees. It begins its analysis with the 2013-2014 PBD&A.

BPNA asserts that Lipsett is bound by the arbitration provision in the 2013-2014 PBD&A. BPNA argues that Lipsett received notice of the 2013-2014 PBD&A via the 2014 Notice

letter and continued using his account after receiving both, assenting to its terms. The Court agrees with BPNA that, under other circumstances, the continued use of an account would evince mutual assent to revised terms. This proposition is well-supported. See Valle, 2015 WL 413449, at *3 (collecting cases). However, even the court in Valle recognized the impact that the validity of the opt-out provision has on whether mutual assent by continued use is formed. See Valle, 2015 WL 413449, at *3 (distinguishing Schnable v. Trilegiant Corp., 697 F.3d 110 (2d Cir. 2012) because "here there was an express opt-out provision that plaintiffs declined to exercise"). Although it is true that Valle assessed the exact same opt-out provision in the exact same agreement, no party in Valle argued, and so the court did not address, the opt-out provision's validity as applied to the customer in question. Unlike Valle, the Court here is charged with such a task.

The 2013-2014 PBD&A's opt-out provision includes the same language as the 2008 PBD&A: "You may reject this Arbitration Provision by mailing a signed rejection notice . . . within forty-five (45) days after the date we open your account." (Dkt. No. 21-7 at 8.) As discussed above, this term does not apply to Lipsett. Indeed, in its supplemental brief, BPNA appears to concede that because Lipsett's account had been opened for nearly a decade at the

time the 2013-2014 PBD&A was noticed, Lipsett could not opt out under this clause. (See Suppl. Br. at 1 (asserting that "[t]he agreement at issue here does not contain language affording account holders . . . the opportunity to opt out of the Arbitration Provision *except* when the account is first opened[.]").)

Instead, BPNA argues that the second clause -- newly added in the 2013-2014 PBD&A -- gave Lipsett the opportunity to opt out. That additional clause allowed customers to "reject this Arbitration Provision by mailing a signed rejection notice . . . if you are an existing customer and we are asking you to enter into a new deposit agreement, within forty-five (45) days after we provide you the new agreement." (Dkt. No. 21-7 at 8.) There is no dispute that Lipsett was an existing customer, so this clause would only apply to him if BPNA was also asking Lipsett "to enter into a new deposit agreement."

BPNA contends that the 2013-2014 PBD&A was such a "new deposit agreement." BPNA asserts that the 2013-2014 PBD&A "completely replaced the prior Agreements" rather then serving as "merely an amendment to the previous agreements." (Suppl. Br. at 3.) For support of its theory, BPNA points to one line in the 2014 Notice that announced that "the enclosed Personal / Business Banking Disclosure and Agreement (your

'Amended Account Agreement'), [] *replaces* any previous deposit account agreement and disclosures you may have had with us." (Id. at 2.) Thus, BPNA maintains that because Lipsett failed to exercise the opt-out procedure within 45 days and continued to use his account, Lipsett is bound by the arbitration provision.

The Court is not persuaded that the 2013-2014 PBD&A is a "new deposit agreement" such that the opt-out provision applied to Lipsett. The 2014 Notice provides ample evidence that, despite "replacing" earlier PBD&As, the 2013-2014 PBD&A was merely an amended or modified agreement as opposed to a new one. For example, the title of the 2014 Notice includes the subtitle "*Amended* Account Agreement." (Dkt. No. 21-6 at 2 (emphasis added).) And BPNA chose to define the enclosed 2013-2014 PBD&A as the "Amended Account Agreement," and refers to it as such throughout. (Id.) Further, BPNA characterized the 2013-2014 PBD&A as including "*[m]odifications* . . . as a result of changes in federal regulations, state law, and bank policy," explained that it had "integrated the *changes*," but also highlighted that "there continue[d] to be" other provisions maintained across the versions. (Id. (emphases added).) Other than the one instance of the word "replace[]" in the 2014 Notice, nothing in the 2014 Notice or 2013-2014 PBD&A indicates that the

agreement is new. Even BPNA's own affiant, Shelley Zielinski, a BPNA Core Branch Administration Manager, declared that the 2013-2014 PBD&A was only the "then-latest update" as opposed to a completely new agreement. (Dkt. No. 21-1 ¶¶ 2, 4.)

The Court's conclusion is further bolstered by BPNA's argument that the 2013-2014 PBD&A was a "new deposit agreement" but that the 2021 PBD&A was not. The 2021 PBD&A's opt-out provision is verbatim to the 2013-2014 PBD&A. (See Dkt. No. 21-5 at 10.) In arguing that Lipsett's later attempt to opt out of arbitration by letter dated January 27, 2022 was invalid, BPNA asserts that the 2021 PBD&A opt-out provision was "inapplicable to Lipsett," entirely, apparently seeking to limit Lipsett's authority to opt out to only the earlier PBD&As. (Suppl. Br. at 3.) BPNA explained that this outcome followed because in 2021 "Lipsett had not opened his account nor entered into a *new* deposit agreement (like as in January 2014)." (Id. at 4.)

BPNA's argument fails. Other than pointing to the 2014 Notice's use of the word "replaces," BPNA does not explain how the 2013-2014 PBD&A constitutes a new agreement, but the 2021 PBD&A does not. And nothing supports BPNA's conclusion that the two agreements should be defined or treated differently. Indeed, both the 2013-2014 PBD&A and 2021 PBD&A are described as the "'master agreement' with respect to all

such services" BPNA provides, indicating that each would
wholly replace any previous agreement. (Dkt. No. 21-5 at 5;
Dkt. No. 21-7 at 4.) The Court concludes that none of the
PBD&As, including the 2013-2014 PBD&A, is offered to Lipsett
as a "new deposit agreement." Accordingly, because Lipsett
could not opt out under either clause of the 2013-2014 PBD&A,
the 2013-2014 PBD&A did not offer Lipsett any meaningful and
reasonable opportunity to opt out of the arbitration
provision and is therefore unconscionable.

BPNA also asserts that Lipsett had a meaningful
opportunity to opt out of the entire agreement, including
arbitration, under the auspices of the 2014 Notice. The 2014
Notice provides the following:

> If after reviewing the Amended Account Agreement, you
> decide that the terms are unacceptable to you in any
> way, you may opt out of it by closing your account and
> withdrawing your funds within sixty (60) days of the
> date of this notice. Otherwise, you will be deemed to
> have accepted the Amended Account Agreement on the
> earlier of (1) your first use of your deposit account
> after five (5) days from the date of this notice or (2)
> sixty (60) days from the date of this notice.

Essentially, the 2014 Notice provided Lipsett with the option
to take-it or leave-it. And it is undisputed that Lipsett did
not "leave-it" under the 2014 Notice.

Under New York law, a form contract offered on a take-
it-or-leave-it basis is not, without more, procedurally
unconscionable. See Anonymous v. JP Morgan Chase & Co., No.

5 Civ. 2442, 2005 WL 2861589, at *6 (S.D.N.Y. Oct. 31, 2005)
("[Agreement] offered on a take-it-or-leave-it basis . . . is
insufficient to render the contract unconscionable[.]")
(collecting cases); Nayal v. HIP Network Servs IPA, Inc., 620
F. Supp. 2d 566, 571-71 (S.D.N.Y. 2009) (same). Under the
facts presented here, however, even if Lipsett had chosen to
"leave-it," that course would not have necessarily saved him
from the arbitration provision. For example, Lipsett has held
an account with BPNA since 2004. BPNA asserts that the
arbitration provision became effective as to Lipsett when it
was added to the 2008 PBD&A. If true, then Lipsett was subject
to the survival clause of the 2008 PBD&A's arbitration
provision. That clause states that the "Arbitration Provision
shall survive the closure of your deposit account." (Dkt. No.
21-4 at 16.) So, even if Lipsett had exercised the option to
close his account in 2014, the survival clause means he would
not have escaped the reach of the 2008 PBD&A's arbitration
provision. Accordingly, the Court finds that the 2014 Notice
likewise did not provide Lipsett a meaningful opportunity to
opt out of arbitration.

Ultimately, once Lipsett was unable to opt out under the
2008 PBD&A, no contract to arbitrate was formed, and Lipsett
was not required to opt out again when BPNA amended the
contract in or about January 2014 or thereafter. BPNA

effectively concedes this point, unequivocally stating that
"[n]o provision of New York law affords consumers the right
to opt out of an arbitration provision each time a consumer
agreement containing one is otherwise amended." (Suppl. Br.
at 1.)

The Court agrees and concludes that a rule stating
otherwise would unduly burden consumers who, already at the
whim of an entity's unilateral power to amend a contract,
would be required to opt out anytime the entity amended the
parties' agreement. And while it does follow that the offering
of a "new" agreement could retrigger the requirement to opt
out, whether the agreement is "new" must be clearly
established by the consent of the parties.[5] Otherwise an
entity's customers could easily be trapped by the very gambit
BPNA employs here -- a post-facto and vague assertion that
certain agreements, as opposed to others, were "new" and re-

---

[5] Although not directly argued, BPNA essentially asserts that only the
2013-2014 PBD&A was a novation of the 2008 PBD&A, thus triggering the
opt-out provision as to Lipsett. Under New York law, "[t]he elements of
a novation are: (1) a previously valid obligation; (2) an agreement of
all parties to: (a) extinguishment of the old contract; and (b) a new
contract; and (3) consideration for the new contract." Trans-Orient Marine
Corp. v. Star Trading & Marine, Inc., 736 F. Supp. 1281, 1283 (S.D.N.Y.
1990). "In order to prove a novation, there must be a 'clear and definite
intention on the part of all concerned that such is the purpose of the
agreement. Not only must the intention to effect a novation be clearly
shown, but a novation [must] never . . . be presumed.'" In re Cohen, 422
B.R. 350, 374 (E.D.N.Y. 2010) (citation omitted). As discussed above, the
only evidence that could support novation is the word "replaces" in the
2014 Notice. And the only evidence of Lipsett's agreement to a novation
is his continued use of his account. Neither is sufficient to establish
the "clear and definite intention" required for a novation. Id.

triggered the customer's opt-out obligation. Or, the counterfactual, where every amended agreement is "new," entrenching customers in a perpetual cycle of needing to opt out every time the contract is amended. Neither is tenable. And such tactics, insofar as they may open a door to deception, weigh heavily in favor of finding that the springing of the arbitration provision on Lipsett was unconscionable. See Brennan v. Bally Total Fitness, 198 F. Supp. 2d 377, 382 (S.D.N.Y. 2002) ("To determine whether a contract was validly formed, a court should focus on evidence of . . . deceptive tactics . . . and any disparity in experience and education, i.e., bargaining power, between the parties."); see also Klos v. Lotnicze, 133 F.3d 164, 168 (2d Cir. 1997) ("Typical contracts of adhesion are standard-form contracts offered by large, economically powerful corporations to unrepresented, uneducated, and needy individuals on a take-it-or-leave-it basis with no opportunity to change the terms."); O'Connor v. Agilant Sols, 444 F. Supp. 3d 593, 604 (S.D.N.Y. 2020) ("[A]rbitration agreements may be unconscionable if procured through misleading or deceptive communications.").

Instead, unless the offer and acceptance of the agreement as "new" is express and unmistakable, whether the party is bound to arbitrate should be determined by the first

instance in which the agreement to arbitrate was offered. Thus, because no contract between BPNA and Lipsett to arbitrate claims under the customer deposit agreement was formed in 2008, when such a clause was first added, and none of the agreements thereafter is offered as a "new deposit agreement" that would re-trigger Lipsett's ability to opt out, Lipsett is not bound to arbitrate his claims with BPNA.

To the extent the Court must also find that the arbitration provisions are also substantively unconscionable, it does. For largely the same reasons discussed in <u>Valle</u>, the Court finds that the "loser pays" provision in the 2008 and 2013-2014 PBD&As are "unreasonably favorable to the party against whom unconscionability is urged." <u>See</u> <u>Valdes v. Swift Transp. Co., Inc.</u>, 292 F. Supp. 2d 524, 534 (S.D.N.Y. 2003). This finding slides the scale the rest of the way towards unconscionability. <u>See</u> <u>Shema Kolainu-Hear Our Voices</u>, 832 F. Supp. 2d at 201.

## IV.  <u>ORDER</u>

For the reasons stated above, it is hereby

**ORDERED** that the motion of defendant Banco Popular N.A. (d/b/a Popular Community Bank) ("BPNA") to compel arbitration with plaintiff Frankie Lipsett under the parties' bank deposit agreements (Dkt. No. 20) is **DENIED**. The Clerk is directed to terminate the motion pending at Dkt. No. 20. BPNA

is directed to answer or otherwise respond to the complaint within 21 days from the date of this Order.

**SO ORDERED.**

Dated:    9 December 2022
          New York, New York

_____
          Victor Marrero
          U.S.D.J.